## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ABDUL-AZIZ RASHID MUHAMMAD**

      **Plaintiff,**

v.                                                                        **Civil Action No. 2:07cv18**
                                                                         **(Judge Maxwell)**

**HARLEY G. LAPPIN, HARRELL WATTS,
K. M. WHITE, B. A. BLEDSOE, J. D. HILL,
JANET BUNTS, DORIS WILLIAMS, M. B.
LICHTY, R. G. MCLEOD, DANE HEADY,
DON BETLER, STEVE HAMLING, PAMELA
BENDER, TERESA PUCKETT, DAVID BUCKINGHAM,
ERICA MASTELLER-BORAM, LT. R. PROFFITT,
DEBORAH LIVINGSTON, TRACY JONES,
JANE AND JOHN DOES, BETHANEY COX,
JOHNATHAN STEVENS AND ALL OTHER
UNKNOWN NAMED OFFICIALS**

      **Defendants.**

### OPINION/REPORT AND RECOMMENDATION

On February 26, 2007, the *pro se* plaintiff initiated this case by filing a civil rights complaint

pursuant to <u>Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388

(1971). In the complaint, the plaintiff asserts that the defendants violated his Eighth Amendment

right to be free from cruel and unusual punishment by denying him adequate and appropriate medical

care for his life threatening Hepatitis C illness and fibrosis of the liver. The plaintiff's claim stems

mainly from the alleged failure of the defendants to properly diagnose and treat his Hepatitis C and

fibrosis by performing a liver biopsy and consulting a specialist, such as a hepatologist or a

gastroenterologist, to formulate an appropriate treatment plan. In explaining the chronology and

history of the plaintiff's illnesses, and the defendants alleged lack of medical care, the plaintiff

outlines a myriad of other claims which he concedes this Court has already addressed in prior cases.

See Complaint (dckt. 1) at 5-6 (citing Muhammad v. Bunts, et al., 1:03cv228 (N.D.W.Va. Oct. 2003); Muhammad v. United States, 1:04cv252 (N.D.W.Va. Nov. 2004)).

## I.    Plaintiff's Prior Cases

### A.    Case No. 1:03cv228

On October 27, 2003, the plaintiff filed a civil rights action against Janet Bunts, David Buckingham, Elizabeth Masteller, Pamela Bender, Teresa Puckett, J. D. Hill, K.M. White, G. Stone, Harrell Watts, B.A. Bledsoe and Doris Williams in which he complained that the defendants violated his First, Fifth and Eighth Amendment rights.  The plaintiff also filed numerous amendments, supplements and other miscellaneous documents in support of those claims.  Upon an initial review of the case, the undersigned found that the plaintiff was specifically raising claims that the defendants were deliberately indifferent to his serious medical needs for failing to provide appropriate medical treatment, medication and a low bunk pass, and that the defendants had conspired against him.  The plaintiff also raised claims of equal protection and retaliation.  After a thorough review of the plaintiff's medical history, the facts underlying the plaintiff's claims, and the various exhibits and documentation provided by the parties, the undersigned found that the plaintiff's claims regarding the treatment he received for his knee and back condition, as well as his complaints regarding his job placement were exhausted.  Moreover, the undersigned found that those claims were potentially meritorious and that summary judgment was therefore, not appropriate at that time.

On the other hand, the undersigned also found that the remainder of the plaintiff's claims, including his claim that he had not received appropriate medical treatment for his Hepatitis C illness and fibrosis of the liver, were not exhausted.  Nonetheless, because the undersigned alternately found

that those claims were without merit, it was recommended that those claims be dismissed with prejudice.

On March 30, 2005, the Honorable Irene M. Keeley, United States District Judge, affirmed in part and rejected in part, the undersigned's January 10, 2005 recommendation. In so doing, Judge Keeley "discern[ed] possible factual issues with respect to the health of Muhammad's liver and the adequacy of his current treatment." Order (dckt. 30) at 9. Thus, because of the potential seriousness of Hepatitis C, Judge Keeley refused to dismiss those claims on the merits, and instead, dismissed the plaintiff's hepatitis C and fibrosis issues without prejudice for the failure to exhaust. In addition, Judge Keeley directed that defendants Bender, Bledsoe, Bunts, Buckingham, Hill, Masteller, Puckett and Williams be served a copy of the complaint and that those defendants answer the plaintiff's claims regarding medication for his left knee pain, the denial of a low bunk pass and his job placement. The remainder of the plaintiff's claims, and the other defendants, were dismissed with prejudice.[1]

After an answer was filed, discovery was conducted, and the filing of several dispositive motions by the defendants, the remainder of plaintiffs' claims in 1:03cv228 was eventually denied and summary judgment was granted to the defendants on March 1, 2007. See dckt. 243. That decision was upheld on appeal to the Fourth Circuit. See dckt. 259.

**B.  Case No. 1:04cv252**

On December 8, 2004, the plaintiff filed an action under the Federal Tort Claims Act ["FTCA"] alleging claims against the United States for negligence, deliberate indifference,

---

[1] The dismissed claims also included claims under 28 U.S.C. § 1367 and 18 U.S.C. § 4042 and other claims pursuant to 18 U.S.C. §§ 241, 242, and 245.

retaliation, discrimination and medical malpractice. Included in those claims were the plaintiff's issues related to his treatment for Hepatitis C and his knee, back, throat and foot problems. Specifically, the plaintiff asserted that Bureau of Prisons ("BOP") staff at FCI-McKean and FCI-Gilmer had breached their duty of care by failing to thoroughly examine and x-ray the plaintiff and to provide him with a liver biopsy and a consultation with a hepatologist or gastroenterologist. However, because the plaintiff failed to meet the requirements for suing a health care provider in West Virginia under W.Va. Code § 55-7B-6, those claims were dismissed on August 25, 2006.

## II. Standard of Review

Because the plaintiff is a prisoner seeking redress from a governmental entity or employee, the Court must review the complaint to determine whether it is frivolous or malicious. 28 U.S.C. § 1915A. Pursuant to § 1915A(b), the Court is required to perform a judicial review of certain suits brought by prisoners and must dismiss a case at any time if the Court determines that the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief. Complaints which are frivolous or malicious, must be dismissed. 28 U.S.C. § 1915A(b).

A complaint is frivolous if it is without arguable merit either in law or in fact. Neitzke v. Williams, 490 U.S. 319, 325 (1989). However, the Court must read *pro se* allegations in a liberal fashion. Haines v. Kerner, 404 U.S. 519, 520 (1972). A complaint which fails to state a claim under Fed.R.Civ.P. 12(b)(6) is not automatically frivolous. See Neitzke at 328. Frivolity dismissals should only be ordered when the legal theories are "indisputably meritless,"[2] or when the claims rely on factual allegations which are "clearly baseless." Denton v. Hernandez, 504 U.S. 25, 32 (1992).

---

[2] Id. at 327.

## III.  Analysis

### A.  Res Judicata and Collateral Estoppel

To the extent that the plaintiff is attempting to raise any issues already addressed in case numbers 1:03cv228 or 1:04cv252, those claims are barred by the doctrines of res judicata and collateral estoppel.  "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  Allen v. McCurry, 449 U.S. 90, 94 (1980) (internal citations omitted).

A court may dismiss *sua sponte* on *res judicata* grounds if it has before it "all relevant data and legal records" or is in the same district in which the original action was filed.  Carbonell v. Louisiana Dept. of Health and Human Resources, 772 F. 2d 185, 189 (5th Cir. 1985).  Thus, this court may take judicial notice of its own files, specifically,  the report and recommendations and orders entered in civil action no. 1:03cv228 and 1:04cv252, and need not "grind the same corn a second time."  See Aloe Creme Laboratories, Inc. v. Francine Co., 425 F.2d 1295, 1296 (5th Cir. 1970) *Cf.* Shoup v. Bell & Howell Company, 872 F.2d 1178, 1182 (4th Cir. 1989)("'[J]ustice is better served by attributing finality to judgment . . . than by second efforts at improved results.'"). Consequently, because the current complaint involves the same defendants, the same set of facts and some of the same issues that were dismissed in civil actions 1:03cv228 and 1:04cv252, those claims already decided on the merits in those cases are  barred by the principles of res judicata and collateral estoppel.

### B.  The Defendants

The plaintiff names a plethora of defendants. However, it appears from the complaint that instead of naming only those individuals who were actually responsible for the alleged deprivation of his constitutional rights as it relates to his Hepatitis C illness and fibrosis of the liver, the plaintiff instead names each and every medical person whoever attended him and each and every supervisory person within the BOP whom the plaintiff may or may not have contacted about those conditions.

1.  Personal Liability

Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir.2001)(internal citation omitted). Therefore, in order to establish liability in a Bivens case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a Bivens case. Rizzo v. Good, 423 U.S. 362 (1976).

In this case, the plaintiff asserts that the following named defendants were personally responsible for his Hepatitis C and fibrosis treatment: Pamela Bender, Teresa Puckett, Janet Bunts, Elizabeth Masteller-Boram, Mary Beth Lichty and Dr. Doris Williams. Accordingly, it appears that those defendants conceivably could have some personal liability in this case. In addition, it appears that the plaintiff sought either verbal or written administrative relief from defendants J. D. Hill, B. A. Bledsoe, R. G. McLeod, Don Betler, Dane Heady, Steve Hamling, Kim White, Harrell Watts and Harley Lappin. It does not appear, however, that those defendants were actually responsible for

plaintiffs' medical treatment.  Instead, it appears that those individuals were named merely because of their status as a BOP official.[3]  For example, defendant Hill was the Associate Warden at the time of the events alleged in the complaint, defendant Bledsoe was the Warden at that time, Kim White was and is the BOP regional director and Harley Lappin was and is the Director of the BOP.  Thus, because those defendants were not personally responsible for the plaintiff's medical care, their liability can only be established under the theory of *respondeat superior* or in their supervisory capacites.

    2.   <u>Respondeat Superior and Supervisory Liability</u>

*Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a <u>Bivens</u> case.  <u>Rizzo v. Good</u>, 423 U.S. 362 (1976).  A suit against government agents acting in their official capacities is considered a suit against the United States itself.  <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally present only another way of pleading an action against an entity of which an officer is an agent.'").  Thus, because remedy under <u>Bivens</u> is against federal officials in their individual capacities, not the federal government, defendants Hill, Bledsoe, McLeod, Betler, Heady, Hamling, White, Watts and Lappin must be dismissed as defendants in this action unless the plaintiff can establish supervisory liability.

In <u>Miltier v. Beorn</u>, 896 F.2d 848, 854 (4th Cir. 1990), the Fourth Circuit recognized that supervisory defendants may be liable in a <u>Bivens</u> action if the plaintiff shows that: "(1) the

---

[3] It appears that the plaintiff is arguing that he approached these individuals in an attempt to resolve the perceived lack of medical attention he had received from medical staff.  Such contact was both verbal and written and appears to be solely for the purpose of obtaining administrative relief.  However, the denial of institutional complaints or grievances is not generally the type of personal involvement required to state a <u>Bivens</u> claim.  <u>See</u> <u>Paige v. Kupec</u>, 2003 WL 23274357 *1 (D.Md. March 31, 2003).

supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." In so finding, the Court recognized that "[s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury." Id. However, the plaintiff cannot establish supervisory liability merely by showing that a subordinate was deliberately indifferent to his needs. Id. Rather, the plaintiff must show that a supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practice. Id. In reviewing claims of medical care, supervisors are entitled to rely on the judgment of the medical staff as to the course of treatment prescribed. Id.

Here, the plaintiff has failed to make the appropriate showing of supervisory liability. The plaintiff does not allege that defendants Hill, Bledsoe, McLeod, Betler, Heady, Hamling, White, Watts and Lappin were personally involved with establishing the course of his medical treatment. Neither has the plaintiff provided any evidence that those defendants tacitly authorized nor were indifferent to any alleged violation of his constitutional rights. At best, the plaintiff has shown that defendants Hill, Bledsoe, McLeod, Betler, Heady, Hamling, White, Watts and Lappin denied his administrative complaints and grievances. As previously noted, however, such involvement is not sufficient to establish an Eighth Amendment claim. See n. 2, infra. Moreover, the plaintiff has failed to show that the denial of those complaints and grievances evidences a tacit authorization or indifference to an alleged violation of his constitutional rights. Quite simply, defendants Hill, Bledsoe, McLeod, Betler, Heady, Hamling, White, Watts and Lappin had no part in the medical

decisions related to the plaintiff's Hepatitis C or fibrosis of the liver, and no supervisory liability related to those claims. In fact, those defendants, as non-medical personnel, were entitled to rely on the medical opinion of the plaintiff's treating physician in establishing the appropriate course of his treatment. Thus, defendants Hill, Bledsoe, McLeod, Betler, Heady, Hamling, White, Watts and Lappin should be dismissed from the complaint with prejudice.

## C. Plaintiff's Hepatitis C and Fibrosis of the Liver Claims

Because the plaintiff's prior claims related to his Hepatitis C illness and fibrosis of the liver claims were dismissed without prejudice for the failure to exhaust in the plaintiff's prior cases, those claims are not barred by the principles of res judicata and collateral estoppel.

In case number 1:03cv228, the undersigned recommended that the plaintiff's claims related to deliberate indifference to his Hepatitis C and fibrosis of the liver conditions be denied and dismissed on the merits. However, Judge Keeley determined that those claims were not appropriate for summary dismissal because she "discern[ed] possible factual issues with respect to the health of Muhammad's liver and the adequacy of his current treatment. In light of the potential seriousness of hepatitis C and the biopsy report indicating portal fibrosis, the Court is reluctant to dismiss this claim without the benefit of a response from the defendants." See 1:03cv228, dckt. 30 at 9. However, to clarify my prior findings in 1:03cv228, the undersigned agrees that there may be possible factual issues with respect to the course of plaintiffs' treatment for his Hepatitis C and fibrosis. Nonetheless, the plaintiff has failed to show that those issues exist with respect to the named defendants pursuant to a claim of deliberate indifference. Instead, the undersigned believes that the plaintiff has, at best, shown that any possible factual issues are more appropriate in a claim of medical negligence or medical malpractice under the Federal Tort Claims Act, against medical

personal at FCI-Lewisburg and/or FCI-McKean.

     1.   <u>Plaintiff's Medical History as Alleged in the Complaint</u>

In 1998, while incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania, the plaintiff began to experience numerous pains in his body. Complaint at 22-23. As a result, the plaintiff attended sick call and reported his symptoms. <u>Id.</u> at 23. Staff performed routine blood tests, but could find nothing abnormal. <u>Id.</u> However, no test for Hepatitis C was performed at that time. <u>Id.</u> The plaintiff was told that his symptoms were a result of the flu or some type of stomach virus.[4] <u>Id.</u> at 23-24.

On March 9, 2001, after three years of numerous sick call visits and tests, the plaintiff was diagnosed with Hepatitis C, a "life threatening disease of the liver, which if active, . . . [can] unequivocally . . . cause death." <u>Id.</u> at 24. The plaintiff was told by the doctor at USP-Lewisburg that his infection was only present in his blood at that time and that his blood enzymes would have to be evaluated every three months. <u>Id.</u> The plaintiff was also told that he was in no imminent danger of harm from the disease at that time. <u>Id.</u> Plaintiff was then informed that he would only have to worry about his Hepatitis C infection if cirrhosis of the liver became apparent. <u>Id.</u> at 25. However, the plaintiff asserts that despite assurances from the doctor at USP-Lewisburg that everything was all right and his test were normal, the plaintiff asserts that he had abnormally high enzyme levels on February 28, 2001 and March 15, 2001. <u>Id.</u> Moreover, the plaintiff was told that Hepatitis C medications were expensive and that the BOP had very stringent standards for dispensing

---

    [4] The plaintiff's symptoms allegedly included headaches, dry mouth and throat, shooting acute stomach pain, kidney and abdominal pain, frequent fatigue, dizziness and nausea, blood in the stool, acute-draining pain over his entire body on occasion, muscle and joint soreness and pain, forgetfulness and total exhaustion at times. Complaint at 23.

such medications.  Id. at 26.  Because the plaintiff did not meet those standards at that time, he asserts he was not provided any medications for his Hepatitis C.  Id.  The plaintiff further asserts that the doctor at USP-Lewisburg should have known that testing his enzyme levels was not a sufficient guide for treatment and that the only proper way to gauge the need for treatment was through a liver biopsy.  Id.

The plaintiff further asserts that he continued to attend sick call at USP-Lewisburg every time he encountered illness from his Hepatitis C infection.  Id.  Despite his consistent complaints to medical staff, the plaintiff asserts that he was denied proper care commensurate with medical standards.  Id.  Moreover, once the plaintiff was diagnosed, he became informed of appropriate treatment standards and began to request such treatments, including an ultrasound of his liver and a liver biopsy.  Id. at 26-27.  However, instead of providing him the appropriate treatment, the plaintiff asserts he was transferred to another institution.  Id. at 27.

Upon his arrival at FCI-McKean, the plaintiff asserts that he immediately apprised medical staff of his Hepatitis C infection and requested to be properly diagnosed by a Hepatologist and/or a Gastroenterologist and a liver biopsy.  Id. at 27.  The plaintiff was informed by medical staff that a liver biopsy is extremely expensive and very dangerous due to the possible blood loss and other complications that could result in the plaintiff's death.  Id. at 28.  Therefore, the plaintiff was told that his blood enzyme levels would continue to be monitored and that a consultation with a Hepatologist or Gastroenterologist was not warranted at that time.  Id.  The plaintiff asserts that medical staff's refusal to send him to a specialist or to order a liver biopsy caused him numerous psychological issues such as hopelessness and emotional distress.  Id.  During his incarceration at FCI-McKean, the plaintiff asserts that although he continued to exhibit increasingly severe

symptoms of his Hepatitis C illness, the medical staff still refused to order a liver biopsy or allow him to consult with a specialist. Id. at 29. However, the plaintiff concedes that the medical staff at FCI-McKean continued to perform routine blood tests and to examine him in relation to his medical complaints. Id. at 29-30. When the plaintiff requested an outside consult or further testing, he was told that his testing results were not abnormal, that further testing would be a danger to him and that his current treatment plan was adequate. Id. at 30. The plaintiff disagrees with the findings of medical staff at FCI-McKean and believes that staff "breached" its "duty of care" to him. Id.

On June 10, 2003, the plaintiff was transferred to FCI-Gilmer. Id. at 33. Upon his arrival, the plaintiff was examined by defendant Bender for his medical intake screening process. Id. At that examination, the plaintiff informed defendant Bender of his Hepatitis C condition and of back and rib pain that appeared to stem from that condition. Id. Defendant Bender allegedly told the plaintiff to report to sick call the next day to have his Hepatitis C concerns evaluated. Id. The next day, the plaintiff attended sick call as instructed. Id. at 34. On this day, the plaintiff was seen by defendant Puckett. Id. When plaintiff arrived in the examination room, defendant Puckett took his triage slip and asked the plaintiff what was wrong. Id. Before the plaintiff could answer, defendant Bunts entered the room and told the plaintiff that he could not have a low bunk pass until his request was reviewed by the Utilization Review Committee ("URC"). Id. Defendant Bunts further informed the plaintiff that his concerns were not emergent and that the plaintiff would see his primary care provider within five days, per policy. Id. at 34-35. The plaintiff asserts that he never had the opportunity during this sick call visit to voice his other health concerns because defendant Bunts had him escorted from medical for being disruptive. Id. at 35. Moreover, the plaintiff alleges that Puckett breached her duty of care to him by failing to provide any medical treatment during this visit.

Id. at 35-36.

After leaving the medical department, the plaintiff discovered that defendant Bunts had attempted to initiate disciplinary proceedings against him for the incident that had occurred in the medical department. Id. at 36. The plaintiff asserts that defendant Bunts actions show she breached the duty of care owed to him by failing to make sound judgment and diagnosis and to make referrals when necessary. Id. at 37.

On June 14, 2003, the plaintiff was stopped by defendant Buckingham when he observed the plaintiff limping on his left knee.[5] Id. The plaintiff told defendant Buckingham that although he had been to medical, he had been told to come back tomorrow. Id. at 38. Defendant Buckingham asked the plaintiff what his name was, and when told, defendant Buckingham indicated that he knew plaintiffs' name and was in the process of responding to a grievance the plaintiff had filed. Id. Defendant Buckingham informed the plaintiff that he could not prescribe him pain medication for his injured left knee and that the plaintiff would need to see his primary medical provider. Id. The plaintiff makes no mention that defendant Buckingham was aware of his Hepatitis C condition or that the two spoke about such condition on that date.

Plaintiff asserts that he was subsequently called to sick call by defendant Masteller-Boram. Id. at 40. During that visit, the plaintiff explained to Masteller-Boram that he was having a rough time with his Hepatitis C and acute pain from his injured knee. Id. Accordingly, Masteller-Boram asked plaintiff to pull his pants down so should examine his knee. Id. After the plaintiff complied, Masteller-Boram began an examination of the plaintiff's knee. Id. During that examination,

---

[5] The defendants' alleged deliberate indifference to the plaintiff's left knee injury was fully addressed on the merits in 1:03cv228. Thus, while mentioning the plaintiff's left knee injury in outlining the plaintiff's medical history herein, that issue will not be otherwise addressed.

however, defendant Bunts entered the examination room.  Id.  Looking at plaintiff, defendant Bunts reiterated her position that the plaintiff's issues were non-emergent and told him that his concerns would be addressed by his primary care provider.  Id.  Defendant Masteller-Boram conducted no further evaluation of the plaintiff's complaints.  Id.  Thus, the plaintiff asserts that Masteller-Boram breached the duty of care she owed to him.  Id.

On June 19, 2003, the plaintiff appeared on the call out sheet to see his primary care provider, defendant Lichty.  Id. at 43.  Plaintiff was seen by Lichty that day and asked about his medical problems.  Id.  The plaintiff complained that he had back and rib pain that appeared to be due to his Hepatitis C condition and also informed Lichty of his other medical problems.  Id. at 42-43.  The plaintiff asserts that defendant Lichty then prescribed him medication that is known to cause dangerous adverse effects on the liver.  Id. at 44.  Plaintiff asserts that Lichty did so out of spite and in an attempt to expedite the plaintiff's Hepatitis C infection and hence, his early death.[6]  Id.  Moreover, defendant Lichty informed the plaintiff that his Hepatitis C concerns would be more fully addressed when he saw his primary care doctor, Dr. Doris Williams.  Id.  Lichty also informed plaintiff that she was aware of his Hepatitis C infection and that she would continue to monitor his enzyme levels every three months.  Id.  Defendant Lichty also told the plaintiff that there was no indication that his liver was in trouble at that time.  Id.

On July 28, 2003, the plaintiff was again evaluated by defendant Lichty concerning complaints caused by his Hepatitis C infection.  Id.  The plaintiff concedes that Lichty reviewed his medical files and told him she would schedule him an appointment with Dr. Williams.  Id. at 45.  Furthermore, Lichty told the plaintiff that Dr. Williams would be able to answer any of his questions

---

[6] The plaintiff provides absolutely no support for this very serious allegation.

regarding his Hepatitis C condition and that Dr. Williams could make a request with the URC to have an ultra sound conducted on his liver.  Id.

On August 1, 2003, the plaintiff was evaluated by Dr. Williams.  Id.  The plaintiff immediately asked why he had not been diagnosed by a Hepatologist or Gastroenterologist and why he had not received a liver biopsy.  Id. at 45-46.  The plaintiff further asked Dr. Williams why he had not received other diagnostic tests such as viral load and geno-strand.  Id. at 46.  Dr. Williams allegedly told the plaintiff that the BOP has stringent standards for treatment of Hepatitis C and that the plaintiff did not meet the standards for the treatment he had requested.  Id. at 46.  Thus, Dr. Williams informed the plaintiff that she would continue to monitor his blood enzyme levels and provide treatment commensurate with BOP standards.  Id.  Dr. Williams informed the plaintiff that such testing is sufficient to accurately keep medical staff informed of his condition.  Id. at 46-47. Dr. Williams further informed the plaintiff that if his condition worsened and he met the standards for further treatment, she would recommend he receive such treatment.   Id. at 47.  The plaintiff asserts that Dr. Williams' assessment and failure to go beyond the standards prescribed by the BOP, breached the duty of care she owed the plaintiff.  Id. at 47-48.  In addition, the plaintiff asserts that Dr. Williams informed him that even if she recommended him for further treatment, he would first have to undergo a psychology evaluation because of the possible side effects associated with Hepatitis C medications.  Id. at 49.

On August 26, 2003, the plaintiff asserts that Dr. Williams received and reviewed his viral load and geno-type tests.  Id. at 49.  The plaintiff asserts that these tests showed that his "levels" were dangerously abnormal.  Id.  However, the plaintiff does not assert what action, if any Dr. Williams took based on these tests.

The plaintiff asserts that during his incarceration at FCI-Gilmer, he continued to get sick and seek prompt medical attention.  Id. at 51.  Although the plaintiff asserts that he was denied adequate medical attention, he does not explain what his complaints were, what actions the defendants took, or how those actions evidence that the defendants were deliberately indifferent to his serious medical needs.  Instead, the plaintiff simply concludes that the defendants breached the applicable standards of care in the medical community without establishing what those standards are or how the defendants failed to meet them.  Id. at 51-52.

On September 29, 2003, the plaintiff received an ultrasound of his liver.  Id. at 53.  The results were completed on October 2, 2003 and plaintiff was called to the prison infirmary to review those results.  Id.  The plaintiff was told that his liver was swollen and his liver infection was unstable.  Id. at 53.  Dr. Williams informed the plaintiff that he would be notified whether a liver biopsy was needed and what, if any, further treatment was necessary.  Id. at 55.  The plaintiff asserts that after finding out the results of his liver biopsy, he pleaded with the defendants to provide "proper medical treatment."  Id. at 56.  However, the plaintiff does not specify what he believes was the proper treatment at that time, or what specifically he requested from the defendants.  Nonetheless, the plaintiff concedes that he was informed that medical staff would continue to monitor his condition and that they were working to find a doctor willing to provide additional treatment.  Id. at 57.  Plaintiff was further advised that his files had been reviewed repeatedly by competent medical staff and that a consult with a Hepatologist or Gastroenterologist was not warranted.  Id.  Plaintiff asserts that he filed numerous grievances with regard to the treatment he received for his Hepatitis C, but that he was continually told that he did not meet the BOP's stringent standards for a liver biopsy or treatment with interferon and ribavarin medications.  Id. at 58.

Sometime near the end of November 2003, the plaintiff was called to a meeting with defendants Hill and Bunts to address the many complaints they had received with regard to the plaintiff's medical care.  Id. at 60.  During this meeting, the plaintiff told defendants Hill and Bunts that he believed a liver biopsy was needed to assess his condition.  Id.  Defendant Bunts immediately explained to the plaintiff that his disease was not at a dangerous stage and that he did not meet the BOP's requirements for further testing and treatment.  Id.  When plaintiff later brought these same concerns to Warden Bledsoe, the Warden informed the plaintiff that he had personally checked into the matter and had repeatedly been assured by medical staff that the plaintiff was receiving adequate medical care.  Id. at 61-62.

Sometime later, the plaintiff attended sick call with defendant Lichty.  Id. at 71.  At that appointment, the plaintiff was informed that his enzyme levels were elevated and defendant Lichty scheduled the plaintiff an appointment with Dr. Williams.  Id.  Moreover, defendant Lichty informed the plaintiff that she had advised defendant Bunts and Dr. Williams of the plaintiff's numerous complaints.  Id.

On January 15, 2004, the plaintiff was seen by physician's assistant Swanson.  Id. at 72.  The plaintiff provides no details of that appointment.

On January 16, 2004, the plaintiff was ill during the night and attempted to go to sick call later that day.  Id. at 72.  However, because the plaintiff's unit was the last to eat, he did not make it to the infirmary until the end of sick call when staff was preparing to lock the doors.  Id.  Although the plaintiff was not seen that day because sick call was over, he was advised to come back the next day.  Id. at 72-73.  It does not appear that plaintiff attended sick call again until January 21, 2004.  Id. at 74.  Again, however, the plaintiff arrived at the end of sick call and was not seen by medical

staff.  Id.

On January 22, 2004, the plaintiff attended an appointment with Dr. Williams.  Id. at 64, 76. At that appointment, the plaintiff again asked for a liver biopsy and a consult with a specialist.  Id. at 64-65.  Dr. Williams explained that she could recommend those things be done, but the final say belonged to the URC.  Id. at 65.

On February 12, 2004, the plaintiff was again seen by Dr. Williams for what plaintiff describes as symptoms "related to being left out in freezing weather to work on [the] compound, everyday, for hours  . . . "[7]  Id. at 80-81.

On March 11, 2004, plaintiff was again seen by Dr. Williams.  Id. at 83.  At that appointment, it was noted that the plaintiff's enzyme levels were elevated, and had been so for a year.  Id.

On March 20, 2004, the plaintiff asserts that he questioned defendant McLeod as to why it was taking so long for him to receive the liver biopsy requested by Dr. Williams in August of 2003. Id. at 84.  The plaintiff asserts that defendant McLeod never gave him a satisfactory answer.  Id. at 85.

The plaintiff was scheduled to receive a liver biopsy on April 15, 2004.  Id. at 88.  However, because he was in the Special Housing Unit ("SHU") at that time, the plaintiff did not receive the scheduled biopsy.  Id. at 88-89.  Plaintiff received his liver biopsy on April 21, 2004.  Id. at 90. According to the plaintiff, he was then advised by defendant Bunts that the liver biopsy results "revealed a normal looking liver."  Id.  Moreover, Bunts allegedly told the plaintiff that the results were good and that the "report indicated that his disease had not caused extensive liver damage." Id.  The plaintiff was then advised that he would continue to be monitored.  Id.  Moreover, the

---

[7] This issue was addressed on the merits in 1:03cv228.

plaintiff acknowledges that the surgeon who performed the biopsy stated, "the liver itself [does] not look bad," but that "we know from laboratory tests [the plaintiff] is positive for Hepatitis C so he *may be* a good candidate for interferon." Id. at 93-94 (emphasis added). The plaintiff believes that defendant Bunts gave him false results and that his biopsy actually revealed that he was "close to cirrhosis of the liver, possibly liver cancer and any other fatal disease that can be caused by Hep-C infection . . ." Id. at 94.

On May 21, 2004, a pathology report of Dr. Gerald Wedemeyer was returned to Dr. Williams. Id. at 110. The plaintiff does not state either the purpose or results of that report.

On June 10, 2004, Dr. Williams came to the plaintiff's cell in the SHU and informed the plaintiff that his liver biopsy revealed that his liver was healthy and that there is no apparent damage to his liver. Id. at 117. The plaintiff asserts, however, that he had reviewed the biopsy and pathology reports and knew that Dr. Williams statement was false. Id. Instead, the plaintiff asserts that the reports showed "extensive, life-threatening damage to [his] liver, a liver in need of medical intervention." Id.

On June 14, 2004, the plaintiff was informed that Dr. Williams had filed a request with the BOP for plaintiff to be considered for interferon/ribavarin treatment. Id. at 118. The plaintiff asserts that this was a lie and that no such request was ever filed. Id.

On June 30, 2004, the plaintiff was transferred from FCI-Gilmer. Id. at 121.

2.  Deliberate Indifference Standard

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment "cruel and unusual

punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a lifelong handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. Wilson, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841,

849 (4th Cir. 1985).  A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health."  See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

       3.   Findings and Conclusions

      Here, the plaintiff's own complaint refutes his claim of deliberate indifference.  It is clear from the facts as stated in the complaint, and accepted as true for purposes of preliminary review, that the defendants were not deliberately indifferent to the plaintiff's Hepatitis C condition.  The plaintiff arrived at FCI-Gilmer on June 10, 2003.  During his year long stay at that facility, the plaintiff's blood enzyme levels were regularly checked, he received viral load tests and geno-strand tests, he was seen by medical staff on numerous occasions, he received a liver ultra sound and a liver biopsy and pathology was conducted on portions of his liver.  Moreover, when the plaintiff complained to supervisory staff about the quality of his medical care, he was informed that staff had personally checked with the plaintiff's medical providers and found no cause for complaint. Additionally, when plaintiff filed numerous complaints about his medical care, supervisory staff, along with medical staff, conducted special meetings with the plaintiff to address his concerns. Throughout the complaint, the plaintiff asserts that the defendants were deliberately indifferent to his serious medical needs, but then in support of those claims, the plaintiff asserts that the defendants breached their duty of care to him by not following acceptable medical standards.  Thus, although the plaintiff alleges a violation of his constitutional rights, his claim sounds in tort.  However, as

noted in case number 1:04cv252, the plaintiff failed to comply with the applicable West Virginia medical liability statutes and he files nothing in this case to show that such compliance has since been achieved.

After a thorough review of the complaint, the undersigned finds that the crux of the plaintiff's claim is that he disagrees with the way in which his Hepatitis C was diagnosed and treated. That claim amounts to little more than a disagreement over the course of the plaintiff's treatment. <u>See</u> <u>Wright v. Collins</u>, <u>supra</u>, (a mere disagreement between an inmate and a physician over the inmate's proper medical care does not state an Eighth Amendment claim). Yet, the plaintiff is not a doctor. The plaintiff admits that he learned of various treatments for Hepatitis C in an attempt to better understand his condition. However, simply because certain treatments are available, such fact does not necessarily mean those treatments are appropriate in every case. <u>See</u> <u>Vintage v. Gibbs</u>, 550 F.2d 926 (4th Cir. 1977) (an inmate is not entitled to the best possible care, only reasonable care); <u>see</u> <u>also</u> <u>Goff v.Bechtold</u>, 632 F. Supp. 697, 698 (S.D.W.Va. 1986) (the denial of an inmate's preferred course of treatment does not violate a constitutional right). The plaintiff's health care providers, trained medical personnel, thoroughly reviewed the plaintiff's files and determined that either the tests the plaintiff requested were dangerous to his health or that his disease was not advanced enough to qualify for such treatment. <u>Estelle v. Gamble</u>, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."). Moreover, those same trained medical professionals determined that the plaintiff's condition did not warrant a consultation with a specialist, such as a Hepatologist or gastroenterologist, and it is well established that an inmate is not entitled to the doctor or course

of treatment of his choice.  See Goff v.Bechtold, supra.

While the undersigned agrees that there may be possible issues of fact with respect to the defendants' treatment of his Hepatitis C condition, the plaintiff has, at best, asserted a claim of medical negligence or medical malpractice.  However, such claims do not rise to the level of a constitutional violation.  See Estelle v. Gamble, 429 U.S. at 106 (a finding of deliberate indifference requires more than a showing of negligence).  Moreover, any perceived violation of the plaintiff's rights or medical negliegence more probably occurred during his incarceration at FCI-Lewisburg and/or FCI-McKean.[8]  The plaintiff received far more treatment at FCI-Gilmer than he did at either of his prior institutions, including the liver ultrasound and liver biopsy he specifically requested.  Accordingly, the plaintiff fails to state a claim with regard to the defendants alleged  deliberate indifference to his Hepatitis C condition.

## D.   The Amended Complaint

During the proceedings in case number 1:03cv228, the plaintiff was transferred from USP-Big Sandy in Inez, Kentucky, to the Northern and North Central Regional Jails in West Virginia to attend a scheduling conference on April 20, 2006.  In the amended complaint, the plaintiff contends that individuals at those Regional Jails were deliberately indifferent to his serious medical needs by interfering with his prescribed medical treatment plan of interferon and ribavarin medication,[9] medical boots and other unspecified medical attention.

At the time the plaintiff filed his amended complaint, a preliminary review of the file had yet

---

[8] This Court does not have jurisdiction over medical personnel at either FCI-Lewisburg or FCI-McKean.

[9] The Court notes that the BOP did eventually provide plaintiff with the requested Hepatitis C medications of interferon and ribavarin that he had requested.

to be conduct and no response had been filed. Thus, the plaintiff was granted permission to amend his complaint as a matter of course pursuant to Rule 15(a) of the Federal Rules of Civil Procedures. However, upon a closer review of the amended complaint at this time, the undersigned finds that the plaintiff's amended claims and additional defendants are improper.

The amended complaint raises claims related to the plaintiff's Hepatitis C and fibrosis conditions. That is also the underlying condition which spawned the instant case. However, the claims raised in the plaintiff's amended complaint are otherwise unrelated to the claims raised in the original complaint. The events in the two complaints occurred at different facilities (BOP facility vs. a West Virginia Regional Jail Authority facility), involve a different set of facts and circumstances, involve different defendants and even a different administrative grievance process. Accordingly, the plaintiff's amended complaint was improperly filed in this case and should be stricken from the record, as should the additional defendants added as a result of said amended complaint.

### IV. <u>Recommendation</u>

For the reasons set forth in this Order, it is recommended that the plaintiff's complaint (dckt. 1) be **DENIED** and **DISMISSED with prejudice** from the active docket of this Court. Moreover, the undersigned recommends that the plaintiff's Amended Complaint (dckt. 18) be **STRICKEN** from the record and the defendants added as a result of that document be **TERMINATED** from this case.

Within ten (10) days after being served with a copy of this recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also

be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Opinion/Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket.

DATED: October 24, 2008.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE